# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 4913 | **DATE** | 8/23/2004 |
| **CASE TITLE** | Nader vs. Keith | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing and continued to 9/15/2004 at 9:30 A.M. .
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   For the reasons stated in the attached Memorandum Opinion and Order, the Court denies the plaintiffs' motion for a preliminary injunction (13-1) and also denies both motions to dismiss filed by the defendants' (6-1, 15-1). Plaintiffs' motion for judgment on the pleadings was previously denied and is therefore terminated (7-1). As discussed above, defendant Tully's motion to dismiss is converted to a motion for summary judgment, and the plaintiffs are ordered to show cause in writing on or before 9/3/04 why summary judgment should not be entered against them.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 2 4 2004 | |
| | Notified counsel by telephone. | | date docketed | 24 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | | |
| OR | courtroom deputy's initials | 2004 AUG 23 PM 4:37 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RALPH NADER; NADER FOR )
PRESIDENT 2004; DORIAN BREUER; )
and JAMES SENYSZYN, )
 )
        Plaintiffs, )
 )
vs. ) Case No. 04 C 4913
 )
JOHN KEITH; WILLIAM McGUFFAGE; )
DAVID MURRAY; ALBERT PORTER; )
WANDA REDNOUR; ELAINE ROUPAS; )
JESSE SMART; BRYAN SCHNEIDER; )
and JOHN TULLY, JR., )
 )
        Defendants. )

DOCKETED
AUG 2 4 2004

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Acting on a petition by John Tully, Jr., the Illinois State Board of Elections recently determined that Ralph Nader, a candidate for President of the United States, had failed to meet the requirements imposed by Illinois law to be placed on the ballot for this November's general election. Nader, his campaign committee Nader for President 2004, and two Illinois voters, Dorian Breuer and James Senyszyn, have sued Tully and the members of the Board, contending that certain of the requirements Illinois imposes as preconditions to placement on the ballot violate the plaintiffs' rights under the First Amendment. The plaintiffs have moved for entry of a preliminary injunction barring the Board from applying these requirements to Nader. The Board of Elections defendants have moved to dismiss the complaint, arguing that this Court should abstain from intervening, as proceedings to challenge the Board's decision could be instituted in

state court. Tully has moved to dismiss for failure to state a claim. For the reasons stated below, the Court denies the defendants' motions to dismiss but also denies the plaintiffs' motion for a preliminary injunction.

## Discussion

The plaintiffs challenge three Illinois statutory provisions that they say impose an unduly severe burden on independent candidates seeking a position on the general election ballot: the requirement that nominating petitions be filed 134 days prior to the general election, 10 ILCS 5/10-6; the requirement that the petitions be signed by 1% of the number of voters who voted at the preceding statewide general election, or 25,000 qualified voters, whichever is less, *id.* 10-3; and the definition of "qualified voter" as a "a person who is registered to vote at the address shown opposite his signature on the petition or was registered to vote at such address when he signed the petition," *id.* 3-1.2.

According to the plaintiffs' complaint, Nader submitted, on or before the June 21, 2004 deadline, petitions containing just under 32,500 signatures. Defendant Tully submitted an objector's petition to the Board of Elections, challenging approximately 19,000 of the signatures. This challenge included claims that some of the signers were not registered to vote at the addresses they listed; that some of the signers' addresses were missing or incomplete; and that some of the signers' signatures were not genuine. The plaintiffs estimate that approximately 90% of Tully's objections were based on the lack of a match between the signer's listed address and the address at which the signer was registered to vote.

Following the filing of Tully's petition, the Board undertook a "binder check" which consisted of comparing the signatures on the petitions with records on file with local election

authorities. According to the plaintiffs' complaint, if the address listed by the signer on the petition does not match with the address at which the signer is registered to vote, the Board considers the signature invalid even if it appears on inspection to match the signature on the application.

According to the Board of Elections' written ruling, issued on August 19, 2004, the Nader campaign submitted petitions with 32,437 signatures. Objections to 12,327 of those signatures were sustained during the binder check. Because the signatures remaining after those challenges were sustained were insufficient in number to satisfy statutory requirements, the binder check was suspended at that point, and Nader was permitted to offer evidence to "rehabilitate" signatures that had been stricken. Following this process, the Board ruled that 72 signatures had been rehabilitated, leaving 20,182 valid signatures. This was 4,818 below the minimum required by Illinois law. For this reason, the Board sustained Tully's challenge and ruled that Nader would not be placed on the ballot for the November election.

In their papers filed in support of their motion for preliminary injunction, plaintiffs estimate that the Board invalidated 5,246 signatures based solely on the fact that the address listed by the signer on the petition did not match his or her address on voter registration records. *See* Affidavit of Andrew B. Spiegel ¶ 4. Plaintiffs contend that each of these signers was in fact that of a registered Illinois voter, *see id.*, and thus that absent the statutory requirement of an address match, Nader would have had signatures sufficient to qualify for placement on the ballot. Defendants appear to dispute this. They point out that the binder check was suspended once the Board culled out invalid signatures sufficient to cut the remainder down to approximately 20,000, and they suggest that if the binder check had continued, even more of the remaining signatures

that were challenged would have been eliminated for one reason or other. The plaintiffs also allege, however, that they continued to collect signatures on petitions after the June 21 deadline and that by July 8, they attempted to file petitions with an additional 5,000-plus signatures but were refused by the Board. *Id.* ¶ 6. For present purposes, the Court will assume that absent the statutory address match requirement, Nader would have had sufficient proper signatures to qualify to be placed on the ballot.

An affidavit submitted on the plaintiffs' behalf by an election law expert indicates that Illinois' June 21 filing deadline is the third earliest among the fifty states, following only Texas (May 10) and Arizona (June 9). *See* Affidavit of Richard Winger, ¶6 and attached exhibit. David Gillespie, a political science professor who specializes on the topic of "third parties" in American politics, states in an affidavit, without contradiction by defendants, that independent candidacies in the race for President "often develop in response to national events and issues, many of which come to the fore during the presidential primary season," Affidavit of J. David Gillespie ¶9, which during this election year was largely concentrated in February and March.[1] Once an independent or minor-party candidate has declared, Gillespie states, he is hamstrung by the need to take immediate steps in fifty-one jurisdictions (fifty states plus the District of Columbia) to get on the ballot, a daunting task which "saps the resources of these new, or virtually new, organizations, which rarely have sufficient funds or deep enough grassroots support to sustain a campaign and a ballot access battle." *Id.* A deadline as early as Illinois', says Gillespie, "cuts off the traditional candidate- and issue-based third party candidate. It falls

---

[1] Consistent with this analysis, it appears that Nader announced his candidacy on or about February 22, 2004. *See* "Defiant Nader declares he'll run; seeks presidency as an independent," Chicago Tribune, Feb. 23, 2004, p. 1.

before or just as a significant candidate ... is building support and attracting the necessary attention, which is too early for such a candidate, absent a substantial warchest, to build the kind of organization needed to collect a substantial number of signatures." *Id.* ¶ 11.

In opposition to the motion for preliminary injunction, Tully has submitted affidavits from local election officials in several Illinois municipalities who attest to the importance of Illinois' June 21 deadline. Gary Rycyzyn, who before his recent retirement was the Director of Elections for the Cook County Clerk's Office for twelve years, states that in 1998, when Illinois law provided that nominating petitions were due in early August, statewide petition challenges involving the Libertarian and U.S. Taxpayers parties prevented the State Board of Elections from certifying a ballot by the August 27 deadline imposed by state law. That year, the State Board advised local election officials that the challenges would not be resolved until October 13, 1998. Because Cook County officials did not believe they would have sufficient time before the November 3, 1998 election to print ballots if they waited until after October 13, they were required to prepare ballots in advance which included the two parties while the challenges were still pending. *See* Rycyzyn Affidavit ¶¶ 8-9 & Ex. 1. As discussed at oral argument in this case, the upshot, if those candidates or parties were later excluded from the ballot following a challenge, would be that some absentee voters would have cast their votes under a misconception regarding the choices available. Following the 1998 experience, Rycyzyn states, a number of county clerks urged the state legislature to move up the deadline for filing nominating petitions to give the State Board adequate time to adjudicate challenges before the August 27 certification deadline. *Id.* ¶ 10. This was what resulted in the change of the filing deadline from ninety-nine days before the election to 134 days.

Lance Gough, the executive director of the Chicago Board of Election Commissioners, notes that although the process of challenging petitions often moves very expeditiously, "[i]f ... many signatures are obtained and the validity of many of those signatures are objected to as questionable, then the review process can be quite extended. ... A signature-by-signature review, coupled with imaginative and/or argumentative legal positions, hearings, and rehabilitation re-hearings can force a fair hearing to run as long as two months." Affidavit of Lance Gough ¶ 3. If Illinois were to permit nominating petitions to be filed in early August, as was the case before the Illinois legislature adopted the 134 day requirement in 1999, it "could delay ballot certification to a point where we local officials are late in ballot preparation, and late in providing voters their rights to vote absentee." That would be particularly true, Gough says, for absentee ballots requested by Illinois citizens who are in the military, for which Gough's office already has 2,100 requests, and "which we want to have on hand by September 3, 2004" to comply with state law. *Id.* ¶ 4. Other duties carried out by election officials, including general absentee voting, ballot counter preparation, and the task of educating the public as to candidate "punch numbers" for punch-card ballots, would likewise be delayed. *Id.*

Tully has also submitted an affidavit from Mark Von Nida, the County Clerk of Madison County, Illinois, which uses optical scan ballots. This, Van Nida states, requires "accurately printed ballot booklet pages for each precinct vote recorder" – one for each prospective voter, or 220,000 altogether. Unlike jurisdictions like Cook County that use punch card ballots, late changes to the ballot would require Madison County to reprint each and every ballot. *See* Affidavit of Mark Von Nida ¶ 3. Because military absentee ballots must be available on September 3 (for which Von Nida now has 800 requests), if there is an unresolved question about

6

ballot certification that is not decided before that date, Van Nida must either arrange for printing of ballots based on his best assumption regarding who will be certified, or delay printing and thereby delay sending ballots to voters registered in Madison County who are in the military. *Id.* ¶¶ 4-5. Von Nida attests that the change in Illinois law which moved up the nominating petition deadline was "a very helpful change, giving election authorities ... the likelihood that ballot certification deadlines are met, and the rights of voters, including military voters, are not harmed." *Id.* ¶ 7.

## Discussion

### 1. *Younger* abstention

The Board of Election defendants have moved to dismiss the case based on *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* and its progeny require federal courts to abstain from interfering in ongoing state judicial proceedings that implicate important state interests and that offer an adequate opportunity for review of federal constitutional claims, unless extraordinary circumstances make abstention inappropriate. *See, e.g., Green v. Benden,* 281 F.3d 661, 666 (7th Cir. 2002) (citing *Middlesex County Ethics Comm'n v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 436-37 (1982)). When the Board of Election defendants filed their motion, the Board had not yet made its decision on Tully's petition; defendants argued that it was inappropriate for this Court to interject itself in the state administrative process. The Court made it clear, however, that we had no intention of making substantive rulings in the case in advance of the Board's decision. But the defendants have also argued that the case for abstention survives the Board's ruling on Tully's petition, in that plaintiffs can present their challenges in state court with a petition for administrative review, and that interference with that process is equally inappropriate

under *Younger*.

The Court rejects defendants' argument. The Board of Elections made its decision on August 19. At present there are no ongoing state proceedings in this case, and thus the primary factual predicate for the Board's abstention argument is no longer operative. Proceedings in the state court would take place only if Nader chose to initiate a challenge there, which as yet he has not done. The Board of Election defendants' argument that abstention is nonetheless appropriate amounts to a contention that a plaintiff with a federal constitutional claim should be foreclosed from bringing that claim in federal court if he can initiate suit in state court to assert the claim. Defendants cite no authority supporting such a rule. Indeed, the rule is to the contrary: "[w]hen federal claims are premised on 42 U.S.C. § 1983 ... – as they are here – we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 472-73 (1974).

We also note two other considerations. First, as voters, plaintiffs Breuer and Senyszyn have a distinct constitutional interest that is at stake in this case. *See Anderson v. Celebrezze*, 460 U.S. 780, 806 (1983) (the "primary concern is not the interest of [the] candidate ..., but rather, the interests of the voters who choose to associate together to express their support for his candidacy, and the views he espoused"); *McLain v. Meier*, 851 F.2d 1045, 1048 (8th Cir. 1988) (voter has standing to challenge constitutionality of state regulation of candidate nomination process). But though Nader himself has the right to seek administrative review in state court, the same is not true of Breuer and Senyszyn: the statutory right of review exists for "a candidate or objector aggrieved by the decision of an electoral board." 10 ILCS 5/10-10.1. Because these

8

plaintiffs are unable to vindicate their constitutional interests via the state administrative review process, there is no basis upon which to apply *Younger* abstention to their claims. Second, even if *Younger* otherwise applied, it is at least possible that the "uniquely important national interest" in Presidential elections, *Anderson,* 460 U.S. at 794-95, might constitute the type of extraordinary circumstance warranting federal intervention even if a state judicial proceeding were ongoing. *Cf. Bush v. Gore,* 531 U.S. 98, 112 (2004) (Rehnquist, C.J., concurring) (opining that distinctly federal interest in Presidential elections warranted federal court intervention in state court's review of election recount conducted by state officials). But those points aside, the predicate for *Younger* abstention simply does not exist in this case: there is no ongoing state proceeding. The Court therefore denies the Election Board defendants' motion to dismiss.

**2.     Preliminary injunction**

To obtain a preliminary injunction, the plaintiffs must show that they have some likelihood of success on the merits and that if an injunction is not granted, they will suffer irreparable injury for which they lack an adequate legal remedy. *See, e.g., Hodgkins v. Peterson,* 355 F.3d 1049, 1055 (7th Cir. 2004). If a plaintiff fails to meet any of these prerequisites, the motion for preliminary injunction must be denied. *See, e.g., Cox v. City of Chicago,* 868 F.2d 217, 223 (7th Cir. 1989).

The right to vote is fundamental to our system of government. But it is nonetheless subject to regulation. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown,* 415 U.S. 724, 730 (1974).

Election laws inevitably affect the individual's right to vote and to associate with others

for political ends. *Anderson,* 460 U.S. at 788. But the mere fact that a state's system creates hurdles which tend to limit the field of candidates from which voters can choose by itself does not require that regulations be narrowly tailored to advance a compelling state interest. *Bullock v. Carter,* 405 U.S. 134, 143 (1972); *Anderson,* 460 U.S. at 788. Rather, the standard is a more flexible one. When reviewing a challenge to a state's election laws, a court must weigh "'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments ...' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (quoting *Anderson,* 460 U.S. at 789. In applying this standard, courts must also consider "the extent to which [the State's] interests make it necessary to burden the plaintiff's rights." *Id.* A "severe" restriction must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed,* 502 U.S. 279, 289 (1992). But "reasonable, nondiscriminatory restrictions" are generally justified by the state's "important regulatory interests." *Libertarian Party of Illinois v. Rednour,* 108 F.3d 768, 773 (7th Cir. 1997) (citing *Burdick,* 504 U.S. at 434).

We begin by assessing Illinois' requirements regarding the due date for nominating petitions and the number of signatures required. "[S]tates have a vital and compelling interest in requiring 'political parties appearing on the general ballot [to] demonstrate a significant, measurable quantum of community support.'" *Libertarian Party,* 108 F.3d at 774 (quoting *American Party of Texas v. White,* 415 U.S. 767, 782 (1974)). This "furthers the state's legitimate interest of 'avoiding confusion, deception, and even frustration of the democratic process at the general election.'" *Id.* (quoting *Jenness v. Fortson,* 403 U.S. 431, 442 (1971)).

The Supreme Court has repeatedly upheld state laws with requirements for nominating

10

petitions equivalent to or more onerous than Illinois' requirement of signatures equal to the lesser of 1% of those who voted in the previous election, or 25,000. *See Norman,* 502 U.S. at 295 (upholding requirement of 25,000 signatures from suburban Cook County alone, 2% of total voters in previous election); *American Party of Texas v. White,* 415 U.S. 767, 783 (1974) (upholding requirement of 1% of total votes for governor in previous election); *Jenness,* 403 U.S. at 438 (upholding requirement of 5% of registered voters for office in question).

Such requirements have been upheld as consistent with constitutional requirements even in situations when the nomination deadline was as early as the one that exists in Illinois. In *American Party of Texas,* the Supreme Court upheld a 1% signature requirement where only fifty-five days were available to candidates to obtain the necessary signatures, a period terminating 120 days before the general election. The Court noted that "[g]iven that time span, signatures would have to be obtained only at the rate of 400 per day to secure the entire 22,000, or four signatures per day for each of 100 canvassers." *American Party of Texas,* 415 U.S. at 786. The Court said it was "unimpressed with arguments that burdens like [these] are too onerous." *Id.* at 787. It found "neither unreasonable nor unduly burdensome" a cutoff date for petition circulation that terminated 120 days before the general election. *Id.* at 787 n.18.

In short, the Supreme Court has upheld against constitutional challenge a scheme virtually indistinguishable from the Illinois scheme that is at issue in this case. It is true that Illinois' deadline is twelve days earlier than the one at issue in *American Party of Texas* – 132 days before the election as opposed to 120. But Illinois, unlike the Texas statute examined in that case, does not limit petition circulation to a fifty-five day period.

We acknowledge the plaintiffs' argument that independent Presidential candidacies often

11

do not arise until after the presidential primary season, as the positions taken by the parties and their likely candidates become crystallized. But as applied to Nader, Illinois provided a considerably longer period of time to qualify for the ballot than the statutory scheme approved in *American Party of Texas*. In 2004, the Presidential primary season was almost entirely focused on February and March. Nader announced his candidacy on February 22, 2004. *See* fn. 1 *supra*. Even if one assumes, as the plaintiffs argue, that some time is needed following a candidate's announcement to develop an organization and begin petition drives, Nader had at least three good months (from about thirty days after he announced his candidacy until the June 21 deadline) to obtain the necessary signatures – a full month longer than the period approved in *American Party of Texas*. Using a calculation similar to that made by the Supreme Court in *American Party of Texas*, Nader had to collect about 280 valid signatures per day for ninety days to qualify; if he had only 100 canvassers for the entire state of Illinois, this would require each canvasser to obtain only three valid signatures per day. The Court cannot say that this requirement is unduly onerous or that it imposes a "severe" restriction on ballot access of the type necessary to trigger heightened scrutiny.[2] And the Illinois legislature's decision to move the filing deadline to an earlier date is justified, for purposes of the constitutional analysis, by the state's legitimate interest in conducting an orderly election process, as attested by the current and former election officials who filed affidavits in support of the defendants.

The plaintiffs argue, however, that stricter scrutiny is given to state election regulations

---

[2] In this regard, the fact that Illinois' filing deadline is earlier than that in most other states is of no consequence. "A court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." *Libertarian Party of Florida v. State of Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (citing *Storer*, 415 U.S. at 729-30).

12

when they impact on Presidential elections. For this they rely largely on *Anderson v. Celebrezze*. In that case, the Court examined a filing deadline for independent candidates that was the same as that for candidates filing to appear on the ballot in the state's primary election. The Court found no legitimate justification for imposing on independent candidates, who by definition are not selected via primaries, this facially "equal" but in fact far more onerous deadline, noting that "'[sometimes] the grossest discrimination can lie in treating things that are different as though they were exactly alike.'" *Anderson*, 460 U.S. at 801 (quoting *Jenness*, 403 U.S. at 442). But as discussed earlier, the considerations that led the Court to invalidate the filing deadline in *Anderson* do not exist in this case. In Illinois, independent candidates have a significant interval following the Presidential primary season to take the steps necessary to get onto the Illinois ballot.

The plaintiffs correctly note that the Supreme Court recognized in *Anderson* that "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Id.* at 794-95. Because of our Presidential electoral system, under which the President is elected not by popular vote but by the votes of electors chosen on a state-by-state basis, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders." *Id.* at 795. The Court went on to say that a state "has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." *Id.* "[T]he pervasive national interest in the selection of candidates for national office ... is greater than any

interest of an individual State.'" *Id.* (quoting *Cousins v. Wigoda*, 419 U.S. 477, 490 (1975)). The plaintiffs argue that this requires strict scrutiny of all state nominating requirements that affect prospective Presidential candidates and limits a state to the least restrictive means of vindicating its interests.

But *Anderson* did not repudiate for Presidential elections the notion that the state has an important interest in regulating ballot access; indeed it reaffirmed that very proposition. *See id.* at 788. Despite its statement that a state's regulatory interest is diminished in the context of a Presidential election, the Court echoed its recognition in earlier decisions that each state has an "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Id.* at 788 n.9. In this Court's view, *Anderson's* focus on a state's lesser interest vis-a-vis Presidential elections amounts to a determination that a state requirement that imposes a severe burden on a candidate's pursuit of the Presidency will not carry the day unless it is supported by a compelling state interest that cannot be carried out in a less restrictive way. Accordingly, *Anderson* requires a court to examine whether particular state requirements that might be justifiable when applied to state and local elections impose an undue burden on Presidential candidacies, particularly those of independents and third parties, when considered in light of factors unique to the process of electing a President.

Even when placed in that heightened focus, Illinois' petition deadline and signature requirements survive constitutional scrutiny. As previously discussed, these requirements did not impose a severe burden on persons like Nader seeking to pursue an independent Presidential candidacy. We reach this conclusion even after considering the features identified by plaintiffs that are unique to Presidential campaigns, particularly those of independent candidates, including

14

the likelihood that the perceived need for such a candidacy might not arise until after the primary season. Taking that fact into account, the Nader campaign still had an adequate opportunity to obtain 25,000 proper signatures from throughout Illinois – the same number of signatures required by the regulation upheld in *Norman v. Reed*, a case in which all 25,000 had to be obtained in suburban Cook County. Even if matters are viewed in the light most favorable to the plaintiffs, Illinois' deadline for filing nominating petitions and its 1% or 25,000 signature requirement were, as applied to Nader, reasonable, non-discriminatory restrictions that were justified by Illinois' important interests in ensuring a reasonable quantum of support for candidates and conducting an orderly election process.

We turn finally to Illinois' address-match requirement, that is, the requirement that the residence address listed by the signer on a nominating petition match that at which the voter is registered. The plaintiffs argue that this requirement falls harder on independent campaigns in general, and on Nader's campaign in particular, because the supporters of such campaigns are more likely to be younger persons, who in turn are more likely to have relocated (and, apparently, to have failed to notify election officials of their address change). Neither part of this contention finds any support in the complaint or the materials submitted by the plaintiffs in support of their motion for a preliminary injunction, and without support it strikes the Court as largely speculative. But even if these propositions were something other than speculative, they would be insufficient to warrant a determination that the address match requirement is constitutionally infirm. The requirement is a mechanism for ensuring that the signers of nominating petitions are actually registered voters, *see Greene v. Board of Election Comm'rs of City of Chicago*, 112 Ill. App. 3d 862, 869, 445 N.E.2d 1337, 1342-43 (1983), a matter in which the state has a significant

interest that is in no way diminished in the context of a Presidential election. Though it is conceivable that a better mechanism might be found for making this verification, that is not the test for the validity of an election regulation of this type. Rather, when a restriction is, like this one, a reasonable one that is not severe in its impact, then it is justified by the state's important regulatory interests. *See Anderson,* 460 U.S. at 788. That is the case here.

For these reasons, the Court finds that the plaintiffs lack a likelihood of success on the merits and therefore denies their motion for a preliminary injunction.

### 3. Tully's motion to dismiss

Tully has moved to dismiss the plaintiffs' complaint for failure to state a claim. The Court's finding that plaintiffs lack a likelihood of success on the merits is based in part on evidence outside the complaint, specifically, the materials submitted by Tully elaborating on the state's interest in the regulations at issue. Thus under the liberal standards that govern federal civil complaints, dismissal for failure to state a claim would be inappropriate. The Court, however, exercises its authority under Federal Rule of Civil Procedure 12(b) to convert defendant Tully's motion to a motion for summary judgment and directs the plaintiffs to show cause in writing within ten days of this order why summary judgment should not be entered against them for the reasons described earlier.

### Conclusion

For the reasons stated above, the Court denies the plaintiffs' motion for a preliminary injunction [docket # 13-1] and also denies both motions to dismiss filed by the defendants' [docket # 6-1, 15-1]. Plaintiffs' motion for judgment on the pleadings was previously denied and is therefore terminated [docket # 7-1]. As discussed above, defendant Tully's motion to dismiss

is converted to a motion for summary judgment, and the plaintiffs are ordered to show cause in writing on or before September 3, 2004 why summary judgment should not be entered against them.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 23, 2004